

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-07-00168-CR
_____

KEITH JEROME JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 34181-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Keith Jerome Johnson appeals the trial court's decision to revoke community supervision for the offense of possession of a controlled substance, contending that the trial court abused its discretion in revoking. Finding no error, we affirm the trial court's judgment.

**Background**

On July 6, 2006, Johnson waived his right to a jury trial, pled guilty to the offense of possession of a controlled substance (less than one gram of cocaine), was found guilty of that offense, and was placed on community supervision for a period of four years. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102 (Vernon Supp. 2007), § 481.115(b) (Vernon 2003). Little more than a year later, the State filed an application to revoke Johnson's community supervision, alleging that Johnson had committed two new criminal offenses: theft and burglary of a motor vehicle. *See* TEX. PENAL CODE ANN. § 30.04 (Vernon Supp. 2007) (burglary of vehicle), § 31.03 (Vernon Supp. 2007) (theft). At the hearing on the State's motion, Johnson pled "not true" to those allegations, and the State presented evidence in support of the motion. The trial court subsequently found those allegations to be supported by the evidence, revoked Johnson's community supervision, and sentenced him to two years' confinement in a state-jail facility. Johnson timely appealed.

The thrust of Johnson's sole appellate issue is that the State's evidence is legally insufficient to support the trial court's decision to revoke community supervision. A community supervision revocation proceeding is neither a civil nor a criminal trial; it is an administrative proceeding. *Cobb*

*v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993); *Bradley v. State*, 564 S.W.2d 727, 729 (Tex. Crim. App. 1978). "We review a trial court's decision to revoke a defendant's community supervision under an abuse of discretion standard." *Bigham v. State*, 233 S.W.3d 118, 121 (Tex. App.—Texarkana 2007, no pet.) (citing *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006)); *see also Naquin v. State*, 607 S.W.2d 583, 586 (Tex. Crim. App. [Panel Op.] 1980). In undertaking this appellate review, we must examine the evidence in the light most favorable to the trial court's ruling, "giving deference to the trial court as the sole trier of facts, the credibility of the witnesses, and the weight to be given to the evidence presented." *Davila v. State*, 173 S.W.3d 195, 197 (Tex. App.—Corpus Christi 2005, no pet.) (citing *Russell v. State*, 685 S.W.2d 413, 419 (Tex. App.—San Antonio 1985, pet. ref'd); *and referencing Jones v. State*, 589 S.W.2d 419, 421 (Tex. Crim. App. 1979)). All that is essentially required under this appellate standard is that there be some evidence to support the trial court's decision. *Id.* (citing *Brumbalow v. State*, 933 S.W.2d 298, 300 (Tex. App.—Waco 1996, pet. ref'd)). Thus, the applicable standard of review takes into account the trial court's obligation to evaluate witness credibility and make the determination to revoke community supervision only when the trial court finds the weight of the credible evidence greater than the countervailing evidence. "Any other type of review [of a revocation proceeding] would effectively attenuate the trial court's discretion." *In re T.R.S.*, 115 S.W.3d 318, 321 (Tex. App.—Texarkana 2003, no pet.).

**The Evidence and the Trial Court's Ruling**

Several witnesses for both sides testified before the trial court. Jeannette Meredith told the trial court that her truck was burglarized at her Kilgore home during the night of May 20– 21, 2007. A pistol had been stolen during the burglary. Five days later, as Meredith was cleaning out the truck, she found a bank slip bearing Johnson's name, address, telephone number, social security number, and bank account number. This bank slip was admitted into evidence at the revocation hearing. Meredith did not know Johnson at the time she found the deposit slip. Meredith also testified that the door had been previously locked, but there was damage done to the door by the burglar which would evidence a forced entry into it. The police did not dust the truck for fingerprint evidence and the pistol was never recovered.

Officer Jerod Sears of the Kilgore Police Department testified that he went to Meredith's home on the morning of May 21, 2007, in response to the reported vehicle burglary. Sears confirmed Meredith's earlier testimony that the passenger side door to her truck was found ajar, but the vehicle itself showed no sign of damage regarding the unauthorized entry. Sears told the trial court that Meredith had indicated that she did not want to have the vehicle dusted for fingerprint evidence. Five days later, Sears received a telephone call from Meredith regarding her having found a bank slip inside the vehicle. According to Sears, Meredith had told him that she did not know the person listed on the bank slip and that this person did not have permission to be in her truck. The slip bore a handwritten date of January 22, 2007.

4

Nadia Hughes is a friend of Johnson. She testified that on the night of May 20 and the morning of May 21, she and Johnson were at a Longview apartment belonging to LaTonya Rossum (Johnson's girlfriend). Hughes remembered that specific evening because it was the night Rossum's aunt had died in a local hospital.

Rossum testified that Johnson was with her during the evening of May 20 and the morning of May 21, 2007. Johnson had accompanied Rossum earlier to a Longview hospital while she visited her dying aunt. After her aunt passed away, Rossum and Johnson returned to Rossum's Longview apartment between five and six in the morning.

Rossum and Johnson later received a telephone call from police regarding the bank slip that had been discovered in Meredith's truck. Rossum and Johnson told police that they were unaware how the bank slip could have gotten into Meredith's truck. Rossum identified the signature on the bank slip admitted into evidence as being Johnson's signature.

Deitra Davis told the trial court that she, Johnson, and Rossum (Davis's cousin) had been at a Longview hospital visiting Davis's aunt on May 20. The three later left the hospital together; Johnson and Rossum provided Davis transportation to her house, talked for about fifteen minutes with Davis's mother, and then left.

Johnson testified that he was at a Longview hospital on May 20, 2007, with his girlfriend, Rossum. Johnson left the hospital with Rossum after five o'clock in the morning, the two dropped a friend off at her house, and then went to Rossum's apartment. Johnson told the trial court that he

5

knew nothing about the burglary of Meredith's vehicle in Kilgore or regarding the theft of her firearm. Johnson also told the trial court that he had been previously employed at Trinity Industries in Kilgore, but that he lost that job at the beginning of 2007.

Initially, and in contrast to Rossum's earlier testimony, Johnson said the signature on the bank slip was not his. Johnson later retracted this part of his testimony and admitted that the signature on the bank slip was his but only the signature (and none of the remaining numerical writing on the bank slip) was of his making. He acknowledged that he had previously signed or otherwise completed banking account slips and given those to his girlfriend so that she could conduct the banking on his behalf.

The trial court then asked Johnson a series of questions concerning the banking slip. In response, Johnson first denied that he wrote any of the numbers on the form that comprised either the amount of the deposit or the zip code for Johnson's address. Johnson then said that he had written the numbers that comprised the date portion on the bank slip, but not the other numbers. The trial court then asked Johnson to compare the numerical sevens in the date with the numerical sevens that appeared in the zip code, as well as on other areas of the bank slip. Johnson agreed with the trial court that the sevens that appear throughout the document consistently appeared to be of the same handwriting.

In announcing its decision to revoke Johnson's community supervision in this case, the trial court stated,

6

The Court is not stupid. That's what you would have to be to ignore the facts that this is your deposit slip or withdrawal slip. There is not one bit of evidence in this case explaining why your withdrawal slip ends up in a vehicle that has been recently burglarized.

Was the car locked, by the way, at the time of entry into it and the theft? I know what the lady testified to, and she probably honestly believes she locked that vehicle. But most humans believe they lock their vehicles and find out many times, "No, I left it unlocked." And I just, I don't, I don't think that vehicle was locked at the time of entry.

The door very well may have been ajar, and that may be what attracted attention for someone to come into it. That's a reasonable hypothesis under the evidence.

The defendant says that the ZIP code information, the writing of the ZIP code on this withdrawal slip is not his. Well, let me tell you what, you don't have to be a handwriting expert to compare the 7 beginning the ZIP code and the 7 beginning the account number on this withdrawal [sic: deposit] slip. They're identical. There's not a question in the world. They're identical.

There is only one way this withdrawal slip ended up in that vehicle; only one way, one logical way it did. And that is that this defendant entered that vehicle and took that gun and holster and somehow lost this particular exhibit, State's Exhibit Rev. 1, in the process. That's not unusual in our society.

So that being said, am I now convinced beyond a reasonable doubt that this defendant committed that crime as alleged in the application to revoke his probation? You bet I am. Absolutely convinced of it. And having been convinced of it, there's only one thing to do about it, and that's to do what I'm about to do.

**Analysis**

Johnson directs our attention to a recently unpublished opinion by one of our sister courts in support of his position that the evidence provided by the State in this case was insufficient. In *Wilkins v. State*, No. 07-05-0396-CR, 2007 WL 836878 (Tex. App.—Amarillo Mar. 19, 2007, no

7

pet.), the Seventh Court of Appeals reviewed a proceeding in which the sole basis for revocation was the probationer's commission of a new offense of retaliation. Wilkins was a nonparty to a custody dispute between Wilkins's wife and her ex-husband, but attempted to attend one of the custody hearings; he was prohibited from attending the hearing by the trial court because Wilkins was improperly dressed (he was wearing shorts rather than long pants). As Wilkins was leaving the courthouse (to go home and change clothes), two attorneys overheard Wilkins remark that he wished the trial judge (who had prohibited Wilkins from attending the custody hearing) would die. The record is clear that Wilkins did not communicate this message directly to that trial judge. The State ultimately learned of Wilkins's abstract comment and filed a revocation motion based on a new offense charge of retaliation. The trial court subsequently found the State's evidence to be credible and revoked Wilkins's community supervision.

On appeal, the appellate court held the evidence on the new charge of retaliation was insufficient because (1) retaliation is a result-oriented offense and (2) there was "no evidence that [Wilkins] intended or was reasonably certain that his stated intent [for that judge's] death would in any way affect his performance as district judge or cause [the judge] to fear retribution." *Id.* at *2. The appellate court therefore reversed the trial court's judgment of revocation. *Id.* at *3.

The factual posture of the case now on appeal is remarkably different from *Wilkins*. *Wilkins* involved the absence of any evidence—direct or circumstantial—to support an essential element of the offense: intent. In the case at bar, there is at least some circumstantial evidence from which the

8

trial court could have inferred Johnson's commission of the crimes: his signed bank slip, with unique identifying information, was found inside the victim's vehicle, yet Johnson and Meredith otherwise had never met or knew of each other.

Johnson also cites this Court's opinion in *Gibson v. State*, No. 06-96-00005-CR, 1997 Tex. App. LEXIS 1447 (Tex. App.—Texarkana Mar. 27, 1997, pet. ref'd) (not designated for publication), in support of his position that the evidence is legally insufficient. In *Gibson*, we held the evidence was insufficient to show that a jail inmate, whose shirt was found to contain small pieces of metal (which the State alleged were deadly weapons and therefore illegal inside a penal institution), knowingly possessed those metal pieces. We reached this conclusion because "Gibson did not have sole possession of the cell, the shirt [at issue] was not issued exclusively to him, the weapons were not found intermingled with his other possessions, and there [was] no testimony that he acted in a manner that would indicate a knowledge of guilt." *Id.* at *9. We thus concluded that there were no affirmative links between Gibson and the alleged deadly weapons; therefore, the evidence was insufficient to support the trial court's decision to revoke Gibson's community supervision. *Id.* at *9–10.

Johnson's situation is different (though only marginally) from that presented in *Gibson*. The evidence in Johnson's case showed he did not have exclusive possession of his banking slips because he had given his girlfriend several signed slips. However, the class of persons who had access to Johnson's banking slips was limited to two persons rather than an entire jail population as was the

9

case in *Gibson*. Additionally, neither Johnson nor Rossum offered any testimony that they had lost or misplaced any of his banking slips (especially ones that Johnson had already signed and dated) in the several months before the offense date of the crimes that formed the basis of this revocation proceeding. In *Gibson*, however, there is at least some circumstantial evidence that there could have been other jail inmates who had sewn the pieces of metal inside the shirt later worn by Gibson.

The State's evidence supporting revocation in the instant case was quite circumstantial and unusually weak. Another judge sitting at trial (including the judges on this Court) might well have a great deal of difficulty in finding that the meager evidence of Johnson's culpability as presented was sufficient to justify a revocation. However, such a view ignores the proper appellate standard of review that we are obligated to apply in these types of cases. Instead of basing such a decision upon what we might have done had we been presiding at the trial judge's bench, we must examine the evidence submitted below in the light most favorable to the trial court and determine whether the trial court could have viewed that evidence and testimony as sufficiently supporting revocation.

Employing a sports metaphor in this case, the trial court decided that the State's pitch (its evidence of Johnson having committed a crime) fell within the strike zone supporting revocation. After reviewing the entirety of the evidence and after according the mandated level of deference to the trial court's evaluation of evidence and witness credibility, we feel bound to hold that it was reasonable for the trial court to conclude that a preponderance of the evidence supports a finding that Johnson committed the new crimes alleged by the State in its application to revoke.

10

In essence, the State's case for revocation in this case falls as close as possible to the outer edges of that judicial strike zone without necessitating reversal for evidentiary insufficiency. We reach this conclusion because the unexplained presence of the banking slip found inside the vehicle of the victim (who, otherwise, had absolutely no connection with Johnson) is a highly suspicious circumstance. The banking slip had unique identifying information about the defendant (including his name, social security number, address, and telephone number) and bore his authenticated signature. Despite the lack of any forensic or eyewitness testimony that would otherwise support the conclusion that Johnson was actually present at the crime scene, it is not an unreasonable conclusion to draw that Johnson's deposit slip would not have been found inside Meredith's truck except for the fact that Johnson himself had been at the crime scene.

Having concluded that the trial court's decision to revoke Johnson's community supervision was not unsupported by sufficient evidence, we affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     April 22, 2008
Date Decided:       April 29, 2008

Do Not Publish

11